UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEBORAH JACKSON, et al., | ) | |
| | ) | |
| Plaintiff-Appellants, | ) | |
| | ) | |
| vs. | ) | 11 C 9288 |
| | ) | |
| PAYDAY FINANCIAL, LLC, et al., | ) | |
| | ) | |
| Defendant-Appellees. | ) | |

## DISTRICT COURT'S RESPONSE TO COURT OF APPEALS REMAND FOR FINDINGS OF FACT

The United States Court of Appeals has remanded two questions to this Court while still retaining jurisdiction of the case. This Court has been asked to make findings of fact as to the following:

1.  Whether the Cheyenne River Sioux Tribe has applicable tribal law readily available to the public and, if so, under what conditions; and

2.  Whether the Cheyenne River Sioux Tribe has an authorized arbitration mechanism available to the parties and whether the arbitrator and method of arbitration required under the contract is actually available.

The parties were asked to submit their own responses to these questions with any documentary exhibits or attachments they desired to accompany their responsive legal briefs. Each party was content to rely on its submissions without the conduct of additional discovery or presentation of testimony. It is on that record that this Court

has prepared the requested findings of fact. The parties' submissions shall accompany the Court's findings of fact.

As to the question of whether there is applicable tribal law readily available to the public, the parties' submissions differ. After a number of failed attempts, the Plaintiffs acknowledged having obtained a copy of the tribe's 1978 Law and Order Code at a cost of $125 from the National Indian Law Library. Defense counsel avers that a copy of the Cheyenne River Sioux Tribal Code was requested by telephone from the National Indian Law Library and received without any payment required, along with PDF copies of Tribal Resolutions and Ordinances enacted between 1981 and 2000, including the Tribe's Commercial Code.

It is this Court's finding that the answer to the first of the remanded questions is in the affirmative. Each party was able to secure a copy of the Tribal Law, although the Plaintiff's did so less readily. Nevertheless, we believe the law can be acquired by reasonable means.

The second of the remanded questions requires consideration of multifaceted aspects of the concept of arbitration and its mechanisms, and its actual availability to the parties before the Court.

Claims relating to Defendants' loans have been the subject of only one arbitration proceeding which is currently pending. That arbitration is the subject of the case entitled *Inetianbor v. Cash Call, Inc.* No. 13 CV 60066 (S.D. Fla. 2013). The

procedural history of that case and relevant associated materials are included in the Plaintiff's submissions. That lawsuit involved a loan of $2,525 for three years with the total payments due under the contract of $11,024.82. As the contract states, the cost of the credit at a yearly rate was 139.31%. By anybody's definition, this is a usurious rate of interest.

The arbitrator selected in the *Inetianbor* case was <u>Robert Chasing Hawk</u>, a Tribal Elder. He was personally selected by Martin Webb, the man who owns and operates the Webb entities which are run as a common enterprise. Mr. Webb is himself a member of the Tribe. Although denying any preexisting relationship with either party in the case, Robert Chasing Hawk is the father of Shannon Chasing Hawk. Robert Chasing Hawk has acknowledged that his daughter worked for one of the companies run by Martin Webb.

Mr. Chasing Hawk is not an attorney and has not been admitted to the practice of law either in South Dakota or the court of the Cheyenne River Sioux Tribal Nation. He has not had any training as an arbitrator and the sole basis of his selection was because he was a Tribal Elder.

Black's Law Dictionary, DeLuxe Fourth Edition, defines "arbitrator" as "a private, disinterested person, chosen by the parties to a disputed question, for the purpose of hearing their contention, and giving judgment between them; to whose decision (award) the litigants submit themselves either voluntarily, or, in some cases,

compulsorily by order of a court." Freedom from bias and prejudice is a stated criteria of the American Arbitration Association's Criteria to serve as an arbitrator. Similar is JAM's Arbitrators Ethics Guidelines which requires freedom from any appearance of a conflict of interest. Illinois Supreme Court Rule 62 states, in part, that "a judge should respect and comply with the law and should conduct himself or herself at all time in a manner that promotes public confidence in the integrity and impartiality of the judiciary. A judge should not allow the judge's family, social or other relationships to influence the judge's judicial conduct or judgment." It should be no less for an arbitrator.

The selection of Robert Chasing Hawk as the arbitrator in the only comparable case is instructive. No arbitration award could ever stand in the instant case if an arbitrator was similarly selected, nor could it satisfy the concept of a "method of arbitration" available to both parties. The selection of Chasing Hawk in the *Inetianbor* case was a purely subjective selection by only one of the parties to the arbitration. The process was not "methodized" in any reasonable sense of the word. Webb and Chasing Hawk are members of the same tribe. The Plaintiffs are not. The employment by Webb of the arbitrator's daughter cannot be ignored. The conduct permitted by the arbitration provisions in this case could never satisfy the straightforward definition in Black's Law Dictionary.

- 4 -

Equally telling about Payday Financial LLC, Cash Call, Inc., and the Webb Entities operations is the State of New Hampshire Banking Department's Cease and Desist Order. The Department first conducted a routine examination of Cash Call. This was followed by the issuance of an administrative subpoena duces tecum to Cash Call seeking a variety of documents related to Cash Call's relationship with Western Sky. Cash Call complied and produced the requested documents.

Among other findings made by the Department, it determined that the respondents were engaged in a business scheme and took substantial steps to conceal the business scheme from consumers and state and federal regulators. The findings included the fact that Western Sky was nothing more than a front to enable Cash Call to evade licensure by state agencies and to exploit Indian Tribal Sovereign Immunity to shield its deceptive practices from prosecution by state and federal regulators. The Department found a reasonable basis to believe the business scheme described constituted an unfair or deceptive act or practice used as a shield to evade licensure from the Department by exploiting Indian Tribal Sovereign Immunity.

While this Court recognizes that no trial has been held to permit a full exposition of all relevant facts, each party was afforded the opportunity to present whatever evidence it wished. It is abundantly clear that, on the present record, the answer to the

second question is a resounding no. Other than this Court's disagreement with Plaintiffs' position as to the availability of tribal law, pages 8 through 10 of "Plaintiffs' Statement of Relevant Facts, and On Further Discovery Required on Limited Remand by Court of Appeals" fairly describe what the facts show. The scheme described in the New Hampshire Banking Department's Cease and Desist Order has been apparently devised for the purpose of evading federal and state regulation of Defendants' activities. The intrusion of the Cheyenne River Sioux Tribal Nation into the contractual arbitration provision appears to be merely an attempt to escape otherwise applicable limits on interest charges. As such, the promise of a meaningful and fairly conducted arbitration is a sham and an illusion.

We respectfully submit our responses to the questions posed.

_____
Charles P. Kocoras
United States District Judge

Dated: August 28, 2013

- 6 -